LAKESHORE LAW CENTER
Jeffrey N. Wilens, Esq. (SBN # 120371)
Macy Wilens, Esq. (SBN # 328204)
18340 Yorba Linda Blvd Ste 107-610
Yorba Linda, CA 92886
(714) 854-7205
fax: (714) 854-7206
jeff@lakeshorelaw.org
macy@lakeshorelaw.org

THE SPENCER LAW FIRM
Jeffrey P. Spencer, Esq. (SBN # 182440)
2 Venture, Suite 220
Irvine, CA 92618
949-240-8595
949-377-3272 (fax)
jps@spencerlaw.net

Attorneys for Plaintiffs
Bridget Ward and Lisa Ward

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRIDGET WARD and LISA WARD,<br>*Plaintiffs,*<br><br>v.<br><br>CROW VOTE LLC, DARRIN AUSTIN, EDWARD MATNEY,<br>*Defendants.* | No. 8:21-cv-01110-FWS-DFMx<br>Complaint filed April 16, 2021<br>Trial Date: February 14, 2023<br>**Class Action**<br>**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION, POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br>Hearing Date: July 28, 2022, 10:00 a.m.<br>Department 10-C<br>Hon. Fred W. Slaughter |

# TABLE OF CONTENTS

Page

COVER PAGE ..... 1
TABLE OF CONTENTS ..... 2
TABLE OF AUTHORITIES ..... 3
NOTICE OF HEARING ..... 5
STATEMENT OF CASE ..... 6
I. LEGAL CLAIMS BROUGHT ON BEHALF OF THE CLASS. ..... 6
II. SIZE AND SCOPE OF THE CLASS. ..... 9
POINTS AND AUTHORITIES ..... 11
I. THE REQUIREMENTS FOR CLASS CERTIFICATION HAVE BEEN MET. ..... 11
A. THE CLASSES ARE NUMEROUS AND ASCERTAINABLE. ..... 12
B. COMMON FACTUAL AND LEGAL ISSUES EXIST. ..... 13
C. PLAINTIFFS' CLAIMS ARE TYPICAL OF THOSE OF THE CLASSES. ..... 14
D. PLAINTIFFS AND THEIR COUNSEL ARE ADEQUATE CLASS REPRESENTATIVES. ..... 14
E. COMMON FACTUAL AND LEGAL ISSUES PREDOMINATE. ..... 16
F. MAINTENANCE OF A CLASS ACTION WILL RESULT IN SUBSTANTIAL BENEFIT TO THE LITIGANTS AND TO THE COURT AND IS THE SUPERIOR METHOD OF RESOLVING THESE CLAIMS. ..... 18
CONCLUSION ..... 20

# TABLE OF AUTHORITIES

Page

**Cases:**

*Abdullah v. U.S. Sec. Assocs., Inc.*
(9th Cir. 2013) 731 F.3d 952 ..... 16

*Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*
(2013) 568 U.S. 455 ..... 11, 12

*Armstrong v. Davis*
(9th Cir. 2001) 275 F.3d 849 ..... 14

*Blackie v. Barrack*
(9th Cir. 1975) 524 F.2d 891 ..... 12

*CRLA v. Legal Servs. Co.*
(9th Cir. 1990) 917 F.2d 1171 ..... 14

*Delarosa v. Boiron, Inc.*
(C.D. Cal. 2011) 275 F.R.D. 582 ..... 12, 14, 16

*Gartin v. S & M NuTec LLC*
(C.D. 2007) 245 F.R.D. 429 ..... 16

*Gen. Tel. Co. of Southwest v. Falcon*
(1982) 457 U.S. 147 ..... 14

*George v. TRS Staffing Solutions, Inc.*
(C.D.Cal. Sep. 13, 2010, No. SACV 09–835 JVS (ANx)) 2010 U.S.Dist.LEXIS 150956 ..... 14

*Hanlon v. Chrysler Corp.*
(9th Cir. 1998) 150 F.3d 1011 ..... 13, 14, 15

*Junod v. NWP Servs. Co.*
(C.D.Cal. July 18, 2016, No. 8:14-cv-1734-JLS (JCGx)) 2016 U.S.Dist.LEXIS 195195 ..... 12

*Lerwill v. Inflight Motion Picture, Inc.*
(9th Cir. 1978) 582 F.2d 507 ..... 14, 15

*Leyva v. Medline Indus. Inc.*
(9th Cir. 2013) 716 F.3d 510 ..... 18, 19

*Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*
(9th Cir. 2001) 244 F.3d 1152 ..................... 19

*O'Connor v. Boeing North Am., Inc.*
(C.D. Cal. 1998) 184 F.R.D. 311 ..................... 12

*Rosario v. Livaditis*
(7th Cir. 1992) 963 F.2d 1013 ..................... 13

*Song v. THC - Orange Cty., Inc.*
(C.D.Cal. Aug. 6, 2018, No. 8:17-cv-965-JLS (DFM)) 2018 U.S.Dist.LEXIS 238253 ..................... 12, 16, 17

*Staton v. Boeing Co.*
(9th Cir. 2003) 327 F.3d 938 ..................... 13

*Stearns v. Ticketmaster Corp.*
(9th Cir. 2011) 655 F.3d 1013 ..................... 18

*Wolin v. Jaguar Land Rover N. Am., LLC*
(9th Cir. 2010) 617 F.3d 1168 ..................... 19

Zaklit v. Nationstar Mortg. LLC (C.D.Cal. July 24, 2017, No. 5:15-cv-2190-CAS(KKx)) 2017 U.S.Dist.LEXIS 117341, at *16, fn. 2 ..................... 16

*Zinser v. Accufix Research Inst., Inc.*
(9th Cir. 2001) 253 F.3d 1180 ..................... 19

**Statutes:**

Ariz. Rev. Stat. Ann., § 13 ..................... 17

**Court Rules:**

Rule 23(g)(l)(A) ..................... 15

## NOTICE OF HEARING

TO EACH PARTY AND THEIR ATTORNEY OF RECORD:

PLEASE TAKE NOTICE that on the 28th day of July 2022, at the hour of 10:00 a.m. or as soon thereafter as counsel may be heard in Department 10-C of the United States District Court, 411 West Fourth Street, Santa Ana, California, Plaintiffs Bridget Ward and Lisa Ward will move for an order pursuant to Rule 23 certifying a class or classes.

Said motion will be made on the grounds set forth in the accompanying memorandum of law. This motion will be based upon this notice, the points and authorities set forth below, the attached declaration(s), the separate statement filed herewith, and the complete files and records in this action.

**This motion is made following the conference of counsel pursuant to Local Rule 7-3 which took place on May 13, 2022. No issues were resolved.**

Lakeshore Law Center
Respectfully submitted,

Dated: May 30, 2022 By: /s/ Jeffrey Wilens

Jeffrey Wilens

Attorney for Plaintiffs
Bridget Ward and Lisa Ward

## STATEMENT OF CASE

### I. LEGAL CLAIMS BROUGHT ON BEHALF OF THE CLASS.

Plaintiffs bring this class action against Defendants Crow Vote LLC, Darrin Austin and Edward Matney. Defendants are alleged to have repeatedly violated provisions of the federal RICO Act and the California Unfair Competition Law (UCL). In brief, Defendants operated the "Favorite Chef" contest, which was conducted online between February 16, 2021 and April 8, 2021. The contest was conducted according to a set of rules and terms and conditions. (Wilens Declaration, ¶ 2, Exhibit 1, Exhibit 2.)

Contestants (also called entrants) competed to win a monetary prize of $50,000 and a magazine feature story about them. The winner was determined by the number of "votes" from members of the public who had a valid Facebook account. All of the contestants were divided into groups (sort of like sports leagues) and the contest period was divided into phases. For example, in the first phase, the top 15 vote getters of each group would advance to the next round and everyone else would be eliminated. As each phase was completed, the number of remaining contestants was reduced until there were four quarterfinalists and then two semifinalists and then one champion. In the later phases, voting was reset, meaning that contestants who might have had 1,000 votes in prior phases will start back at zero votes; thus, they would need to recruit new votes to have any hope of advancing further. (Exhibit 1, pp. 3–5; Exhibit 2, pp. XX-XX.)

The contest permitted free voting but was designed to make it unlikely if not impossible someone could win without paid voting. A voter could vote one vote for free for each 24 hour period, provided he had a Facebook account. However, a voter, with or without a Facebook account, could also purchase unlimited additional paid votes each day. The limitation on paid votes was that the contestant could not pay for votes for himself or herself. (Exhibit 1, pp. 3–4; Exhibit 2, p. 4.) However, spouses, family members, friends, and others could pay to vote for the contestant without any limits. In fact, the

minimum charge for voting was $10 for 10 votes. All vote purchases were non-refundable. (Exhibit 2, p. 5.)

The Terms and Conditions specify, and the Parties agree that legality of the contest must be judged by Arizona law. (Exhibit 2, p. 3.)

In Arizona, gambling is defined as the "act of risking or giving something of value for the opportunity to obtain a benefit from a game or contest of chance or skill or a future contingent event." (Ariz. Rev. Stat. Ann. § 13–3301 (4).) Plainly, the Favorite Chef competition is a form of gambling. Participants pay money to obtain the benefit of their favored contestant (typically a family member or friend) having a chance (not a certainty) of winning a cash prize and other consideration. There is nothing in the statute that says the persons gambling their money have to be eligible to win the prize; it is still gambling if money is risked by the gambler for a chance at enriching a favored person. Even if Defendants argue the winner is not determined by chance (a debatable point as explained below), it is determined by "a future contingent event" (i.e., the results of the vote count). Gambling is conducted "as a business" when it is conducted with "the object of gain, benefit or advantage, either direct or indirect, realized or unrealized, but not if incidental to a bona fide social relationship." (Ariz. Rev. Stat. Ann. § 13–3301 (2).)

Arizona law only recognizes four forms of legal gambling. Two of them are conducted under state regulation such as tribal gambling and gambling conducted at fairs, charitable raffles, etc., and clearly do not apply to this contest. That leaves "amusement gambling" and "social gambling."

To qualify as "legal" gambling under the rubric of "amusement gambling," the contest must meet four requirements (Ariz. Rev. Stat. Ann. § 13–3301 (1)):

(A) The players actively participate in the game or contest;

(B) The outcome is not in the control to any material degree of any person other than the players;

(C) No prizes are offered as a lure to separate the players from their money.

(D) One of these alternatives is present:

(1) No benefit is given to the player or players other than an immediate and unrecorded right to replay which is not exchangeable for value.

(2) The gambling is an athletic event and no person other than the player or players derives a profit or chance of a profit from the money paid to gamble by the player or players.

(3) The gambling is an intellectual contest or event, the money paid to gamble is part of an established purchase price for a product, no increment has been added to the price in connection with the gambling event and no drawing or lottery is held to determine the winner or winners.

(4) Skill and not chance is clearly the predominant factor in the game and the odds of winning the game based upon chance cannot be altered. (See also, Ariz. Op. Atty. Gen. No. I98–002 (Ariz.A.G.), 1998 Ariz. AG LEXIS 1.)

In previous briefing on the motion to dismiss, Defendants did not argue that any of the four exceptions apply to this contest. However, to the extent they do, the Court can resolve on a classwide basis whether any of the exceptions apply to the contest. For example, under "amusement gambling," the requirement that the "players" (the voters) actively participate in the contest is missing as their only involvement is paying for votes and they are not the contestants. Also, a prize ($50,000) is offered as a "lure to separate the players from their money." Moreover, none of the alternative requirements under subdivision (d) of Section 13–3301 (a) are present.

Legal "Social Gambling" means "gambling that is not conducted as a business and that involves players who compete on equal terms with each other in a gamble" if certain other requirements apply. (Ariz. Rev. Stat. Ann. § 13–3301 (7)). Without getting into the other requirements, some of which are also not met, the Favorite Chef contest was not exempt under the "social gambling" rubric because it clearly was conducted as a business and a very profitable one for Defendants as they earned millions of dollars even after paying out the grand prize and making a charitable donation.

The RICO claim is premised on establishing that the contest was illegal gambling under Arizona law. Plaintiffs alleged violations of 18 U.S.C. § 1952 (Interstate travel or

transportation in aid of racketeering enterprises) and 18 U.S.C. § 1955 (operation of illegal gambling business). For example, Section 1955 (b) (1) defines an "Illegal Gambling Business" as "a gambling business which:

> (1) Operates in violation of the law of the State in which it is conducted;
>
> (2) Involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and
>
> (3) Has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

It can be determined on a classwide basis whether these requirements were met.

The UCL prohibits any person from engaging in unfair competition, which includes any "unlawful, unfair or fraudulent business act or practice." (Business and Professions Code § 17203.) Plaintiffs allege the foregoing unlawful business practices as well as violations of various California laws.

## II. SIZE AND SCOPE OF THE CLASS.

As explained in greater detail below, Plaintiffs move to certify a Main Class and a California Subclass. The Main Class consists of: "All persons residing in the United States who, on or after February 16, 2021, paid for votes for contestants participating in the Favorite Chef contest." The California Subclass consists of: "All persons residing in California who, on or after February 16, 2021, paid for votes for contestants participating in the Favorite Chef contest."

In discovery, Defendants produced aggregate information about the classes as well as a spreadsheet identifying a sample of 9,648 class members (some people from California but most from other states). Defendants stated that about 1,430,000 individuals cast votes in the Favorite Chef contest; about 110,000 individuals paid to cast votes, while about 1.32 million individuals cast free votes. Defendants also reported the total number of votes cast (as opposed to the total number of voters). Approximately 9.6

million paid votes were cast and approximately 3.9 million free votes were cast in the Favorite Chef contest for a total of 13.5 million votes. In other words, about 8% of the voters (110,000) cast about 71% of the votes (9.6 million). The aggregate amount paid by the 110,000 class members was $6.6 million. Defendants' interrogatory responses reflect that only about $180,000 of the $6.6 million in paid votes was refunded or charged back by the consumer. That is an average of $60 per class member. (Wilens Declaration, ¶¶ 3–4; Exhibits 3, 4.)

Just considering the sample of class members reflected on the spreadsheet, 1,234 of the 9,648 of them have zip codes ranging between 90001 and 96162 which correspond with addresses in the State of California. That is 12.7 percent. Therefore, it is reasonable to deduce at least 13,970 members of Main Class are also members of the California Subclass. (Wilens Declaration, ¶ 5.)

## POINTS AND AUTHORITIES

### I. THE REQUIREMENTS FOR CLASS CERTIFICATION HAVE BEEN MET.

By this motion, Plaintiffs seek certification of a Main Class comprising:

*All persons residing in the United States who, on or after February 16, 2021, paid for votes for contestants participating in the Favorite Chef contest.*

Plaintiffs also seek certification of a California subclass comprised of

*All persons residing in California who, on or after February 16, 2021, paid for votes for contestants participating in the Favorite Chef contest.*

To certify a class, Plaintiffs must present evidence that all of the requirements of Federal Rules of Civil Procedure, Rule 23 (a) have been met and that the requirements of at least one of the subdivisions of Rule 23 (b) have been met. Plaintiffs seek to certify this matter under Rule 23 (b) (3). Under Rule 23 (a), the requirements are: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Under Rule 23 (b) (3), Plaintiffs must also show that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." As discussed below, all of these requirements have been met.

In *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds* (2013) 568 U.S. 455, 466 the Supreme Court reaffirmed that certification is essentially a procedural requirement that does not concern whether an action is legally or factually meritorious. "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that

they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." (*Id.*)

Thus, "neither the possibility that a plaintiff will be unable to prove his allegations, nor the possibility that the later course of the suit might unforeseeably prove the original decision to certify the class wrong, is a basis for declining to certify a class. . . ." (*Blackie v. Barrack* (9th Cir. 1975) 524 F.2d 891, 901.) Moreover, "the court is bound to take the substantive allegations of the complaint as true," as there is "sufficient information to form a reasonable judgment." (*Ibid.*, n. 17.)

### A. THE CLASSES ARE NUMEROUS AND ASCERTAINABLE.

Rule 23 (a) (1) requires a showing that "the class is so numerous that joinder of all members is impracticable." The Main Class numbers about 110,000 class members, while the California Subclass is at least 13,000 members. The Central District court has previously held that as a general rule, classes of forty or more are considered sufficiently numerous. (*Song v. THC - Orange Cty., Inc.* (C.D.Cal. Aug. 6, 2018, No. 8:17-cv-965-JLS (DFM)) 2018 U.S.Dist.LEXIS 238253, at *6; *Delarosa v. Boiron, Inc.* (C.D. Cal. 2011) 275 F.R.D. 582, 587.) Therefore, the classes are numerous.

The courts of this district have ruled that apart from the explicit requirements of Rule 23(a), a plaintiff must show an "identifiable and ascertainable class exists". (*Junod v. NWP Servs. Co.* (C.D.Cal. July 18, 2016, No. 8:14-cv-1734-JLS (JCGx)) 2016 U.S.Dist.LEXIS 195195, at *14.)

> A class definition should be "precise, objective, and presently ascertainable." However, the class need not be "so ascertainable that every potential member can be identified at the commencement of the action." As long as "the general outlines of the membership of the class are determinable at the outset of the litigation, a class will be deemed to exist." Thus, a class will be found to exist if the description of the class is definite enough so that it is administratively feasible for the court to ascertain whether an individual is a member. (*O'Connor v. Boeing North Am., Inc.* (C.D. Cal. 1998) 184 F.R.D. 311, 319.)

Here, the membership of the classes is ascertainable from Defendants' business records which includes the name, email address and zip code of the persons who paid money to vote in the contest. Although Defendants only produced a list of some of the class members, they could use the same ability to produce a list of all of the class members.

Defendants may argue that some people paid for votes, but their votes were disqualified or the charges were reversed or refunded. Such persons would not be class members. Their identity would be ascertainable from Defendants' merchant account records since both charges and chargebacks would be listed. Defendants' interrogatory responses reflect that only about $180,000 of the $6.6 million in paid votes was refunded or charged back by the consumer. So this would have a trivial impact on the number of class members.

Therefore, the class is ascertainable as defined.

### B. COMMON FACTUAL AND LEGAL ISSUES EXIST.

A class has sufficient commonality under Rule 23(a)(2) if "there are questions of law or fact common to the class." "The fact that there is some factual variation among the class grievances will not defeat a class action" and a "common nucleus of operative facts is usually enough to satisfy the commonality requirement of Rule 23(a)(2)." (*Rosario v. Livaditis* (7th Cir. 1992) 963 F.2d 1013, 1017–1018.) The common question requirement can be satisfied by a shared legal issue with divergent factual predicates or by a common core of salient facts with disparate legal remedies. (*Staton v. Boeing Co.* (9th Cir. 2003) 327 F.3d 938, 953; *Hanlon v. Chrysler Corp.* (9th Cir. 1998) 150 F.3d 1011, 1019.)

Here, the common facts are that all of the class members paid money to cast votes in the same contest pursuant to the same set of rules. The common legal issue is whether the contest, when conducted pursuant to the published rules, was legal or illegal under

Arizona law. (See, *Delarosa v. Boiron, Inc.*, *supra*, 275 F.R.D. at p. 589 (commonality requirement satisfied where the same determination will "resolve an issue that is central to the validity of each of the claims in one stroke").)

### C. PLAINTIFFS' CLAIMS ARE TYPICAL OF THOSE OF THE CLASSES.

The claims of the class representative must be typical of but need not be identical to the claims of the class. The class representative "must be part of the class and possess the same interest and suffer the same injury as the class members." (*Gen. Tel. Co. of Southwest v. Falcon* (1982) 457 U.S. 147, 156; *CRLA v. Legal Servs. Co.* (9th Cir. 1990) 917 F.2d 1171, 1175.) "[R]epresentative claims are 'typical' if they are reasonably co-extensive with those of absent class members, they need not be substantially identical." (*Hanlon v. Chrysler Corp.*, *supra*, 150 F.3d at p. 1020.) Typicality is "satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Armstrong v. Davis* (9th Cir. 2001) 275 F.3d 849, 868; *George v. TRS Staffing Solutions, Inc.* (C.D.Cal. Sep. 13, 2010, No. SACV 09–835 JVS (ANx)) 2010 U.S.Dist.LEXIS 150956, at *6 (claims were typical as they arose from the same event or course of conduct and are based on the same legal theory)."

What happened to Plaintiffs was typical of what happened to many thousands of other persons who paid money to vote in this contest—Plaintiffs had a person they preferred to win the contest and they paid money to increase the chance their preferred candidate would win. Typicality has been demonstrated.

### D. PLAINTIFFS AND THEIR COUNSEL ARE ADEQUATE CLASS REPRESENTATIVES.

Plaintiffs and counsel are adequate class representatives. (*Lerwill v. Inflight Motion Picture, Inc.* (9th Cir. 1978) 582 F.2d 507, 512.) The requirement of fair representation involves two factors. "First, the named representatives must appear able to pros-

ecute the action vigorously through qualified counsel, and second, the representatives must not have antagonistic or conflicting interests with the unnamed members of the class." (Id.) The inquiry whether the class representative will adequately represent the class focuses on two questions: 1) whether the class representative and his counsel have any conflicts of interest with the class members, and 2) whether the class representative and its counsel will vigorously prosecute the action for the class. (*Hanlon v. Chrysler Corp.*, *supra*, 150 F.3d at p. 1020.)

Plaintiffs' claims are coextensive with those of the class members. Both Plaintiffs are members of the national class and Bridget Ward is also a member of the California subclass. (Bridget Ward Declaration, ¶¶ 5, 6; Lisa Ward Declaration, ¶¶ 5, 6.) Both have no conflicts of interest with other class members and are committed to working in the best interests of the classes. (Bridget Ward Declaration, ¶¶ 2, 4; Lisa Ward Declaration, ¶¶ 2, 4.) They understand their roles as class representatives. (Bridget Ward Declaration, ¶ 3; Lisa Ward Declaration, ¶ 3.)

As to the adequacy of Plaintiffs' counsel, the Court must consider

(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class. (Federal Rules of Civil Procedure, rule Rule 23 (g)(1)(A).)

Plaintiffs' counsel brought appropriate claims, defeated motions to compel arbitration and to dismiss the case, pressed for discovery compliance and have acquitted themselves well. Both of Plaintiffs' counsel have extensive experience successfully prosecuting class actions, including in similar claims involving unlawful business practices and have ample knowledge of this area of law. Finally, counsel will commit what resources are necessary to prosecute this lawsuit as a class action. (Wilens Declaration, ¶¶ 6–22; Spencer Declaration, ¶¶ 2–14.)

### E. COMMON FACTUAL AND LEGAL ISSUES PREDOMINATE.

Under Rule 23 (b) (3), a plaintiff must demonstrate that questions of law or fact common to the class members "predominate over any questions affecting only individual members" and that a class action is "superior to other available methods for the fair and efficient adjudication of the controversy."

The predominance analysis under Rule 23(b)(3) focuses on the "relationship between the common and individual issues in the case, and tests whether the proposed class is sufficiently cohesive to warrant adjudication by representation." (*Abdullah v. U.S. Sec. Assocs., Inc.* (9th Cir. 2013) 731 F.3d 952, 964, cert. denied, 135 S. Ct. 53 (2014); see also, *Delarosa v. Boiron, Inc.*, *supra*, 275 F.R.D. at p. 594.) "Rule 23(b)(3) requires [only] a showing that questions common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." (*Id.*; see also, *Abdullah v. U.S. Sec. Assocs., Inc.*, *supra*, at p. 964.)

"When one or more of the central issues in the action are common to the class and can be said to predominate," a class action will be considered proper "even though other matters will have to be tried separately." (*Gartin v. S & M NuTec LLC* (C.D. 2007) 245 F.R.D. 429, 435.) "The Court must determine whether plaintiffs have shown that there are plausible classwide methods of proof available to prove their claims." (*Zaklit v. Nationstar Mortg. LLC* (C.D. Cal. July 24, 2017) 2017 U.S.Dist.LEXIS 117341, *16, n. 2.)

As a court in this district recently explained in *Song v. THC - Orange Cty., Inc.*, *supra*, 2018 U.S.Dist.LEXIS 238253, at *6: "[a]t the class certification stage, however, the Court is asked to determine whether the claim presents a common question with common answers, not the likelihood of the claim's success on the merits." In that case, the defendant conceded it had a uniform practice, but insisted that there was no violation as matter of law. The Court suggested there may be merit to that defense. However, the Court granted certification, pointing out that such arguments "underscore that class treatment is appropriate for this claim: the legal conclusion as to the accuracy of the

wage statement will provide a common answer to the common legal question Song present." (Id.)

In the instant case, the predominating legal issues are common to all Class Members—was the contest "gambling" under Arizona law and were any of the exceptions that make gambling legal present. As noted above, Defendants' only defense appears to be the argument that the contest was not "gambling" because the class members who paid money to vote were not "risking or giving something of value for the opportunity to obtain a benefit from a game or contest of chance or skill or a future contingent event." (Ariz. Rev. Stat. Ann., § 13, subds. –3301 (4).) Obviously, the voters were giving money and Favorite Chef was a contest of chance, skill or determined by a future contingent event. That means Defendants rely entirely on the argument there was no "benefit" to class members who paid the money because someone else stood to win the prize, not themselves personally. Resolution of the defense is not dependent on any class members' individual circumstances, but instead can be determined on a classwide basis. Either Favorite Chef is gambling with respect to all class members or it is not gambling with respect to any class members.

Defendants may note that some class members are spouses of the contestants, others are family members or friends, and others still might be strangers who simply wanted to vote for a member of the community or some contestant whose cooking photos impressed them. However, these differences are irrelevant to whether there was benefit to the paying voter. If a voter spent money to vote for someone, it is presumed that he or she would feel good if that person won the contest. That feeling of satisfaction is the benefit that will always be present.

Defendants might argue some voters might have been making a charitable donation, which would not be gambling. The main problem with that argument is the contest rules stated that:

BY PARTICIPATING IN THE COMPETITION AS AN ENTRANT OR

A VOTER, YOU ARE NOT MAKING ANY DONATION TO CHARITY. PURCHASING VOTES DOES NOT QUALIFY AS A DONATION TO CHARITY. VOTE PURCHASES ARE NOT TAX DEDUCTIBLE. SPONSOR ALONE IS MAKING A DONATION OF CONTEST PROCEEDS TO CHARITY. BY SIMPLY PARTICIPATING IN THE COMPETITION AS AN ENTRANT, VOTER OR WINNER, YOU ARE NOT MAKING ANY DONATION TO CHARITY. (Exhibit 1, p. 10.)

The Contest Terms and Conditions similarly emphasize that purchased votes are not donations and are not tax deductible. (Exhibit 2, pp. 1, 5.) Therefore, there is no basis to any speculation that any significant number of class members (or any class members) were trying to make charitable contributions and did not care about the contestant's winning the contest.

Finally, Plaintiffs reached out to some of the class members identified in the discovery responses. Declarations from some of them are attached as Exhibit 2. (Wilens Declaration, ¶ 6, Exhibit 4.) As can be seen in the declarations, the class members consistently testified that they paid for the votes for the benefit of helping their favored contestant win and did not list any other reason.

Defendants may also argue individual damages may vary from class member to class member because different class members spent different amounts of money. However, variations in the amount of damages does not defeat class certification. (*Stearns v. Ticketmaster Corp.* (9th Cir. 2011) 655 F.3d 1013, 1026; *Leyva v. Medline Indus. Inc.* (9th Cir. 2013) 716 F.3d 510, 514.) Defendants have not articulated a theory under which some class members would be entitled to damages, but others would not. As noted above, Defendants' defense is "all or nothing."

### F. MAINTENANCE OF A CLASS ACTION WILL RESULT IN SUBSTANTIAL BENEFIT TO THE LITIGANTS AND TO THE COURT AND IS THE SUPERIOR METHOD OF RESOLVING THESE CLAIMS.

In deciding whether a class action would be superior to individual lawsuits, the court will usually consider four factors set forth in Rule 23 (b) (3). The matters pertinent to these findings include: (A) the class members' interests in individually controlling the

prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action. (See also, *Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.* (9th Cir. 2001) 244 F.3d 1152, 1163.)

All of these factors militate in favor of certifying a class. Regarding points (A) and (C), it would not be practical to bring individual lawsuits to seek damages averaging $60 per class member. “Where recovery on an individual basis would be dwarfed by the cost of litigating on an individual basis, this factor weighs in favor of class certification.” (*Wolin v. Jaguar Land Rover N. Am., LLC* (9th Cir. 2010) 617 F.3d 1168, 1175; see also, *Zinser v. Accufix Research Inst., Inc.* (9th Cir. 2001) 253 F.3d 1180, 1190.) “In light of the small size of the putative class members' potential individual monetary recovery, class certification may be the only feasible means for them to adjudicate their claims. Thus, class certification is also the superior method of adjudication.” (*Leyva v. Medline Indus. Inc.*, *supra*, 716 F.3d at p. 515.)

Also, some 110,000 individual lawsuits would be necessary, and typical consumers would lack the resources or knowledge to bring claims premised on a legal analysis of gambling laws and the recognition that the contest was illegal under Arizona law.

Regarding point (B), Plaintiffs are not aware of other pending lawsuits against Defendants in California concerning the same claims.

Regarding point (D), no significant management difficulties are foreseen.

Therefore, a class action is a superior method of resolving the claims of 110,000 class members.

## CONCLUSION

For the above stated reasons, Plaintiffs respectfully urge the Court to grant the motion to certify the classes.

Lakeshore Law Center

Respectfully submitted,

Dated: May 30, 2022 By: /s/ Jeffrey Wilens

Jeffrey Wilens

Attorney for Plaintiffs
Bridget Ward and Lisa Ward